**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| **DEBORAH A. GERALD, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 07-00475-CV-W-GAF** |
| | ) | |
| **KESSINGER/HUNTER** | ) | |
| **MANAGEMENT COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

Presently before the Court are Defendant Kessinger/Hunter Management Company, Inc.'s ("Defendant") Motions for Summary Judgment on Plaintiffs Deborah Gerald's ("Gerald"), Ervin Darryl Harris' ("Harris"), and Jo Denise Marshall's ("Marshall") (collectively "Plaintiffs") Claims. (Doc. ## 32, 34, 36). Defendant argues no genuine issues of material fact remain and it is entitled to judgment as a matter of law on Gerald's, Harris', and Marshall's claims. *Id.* Plaintiffs oppose Defendant's Motions. (Doc. ##40-42). For the following reasons, Defendant's Motions are GRANTED.

**DISCUSSION**

**I.      Facts**

The present case arises from Defendant's alleged racial discriminatory actions towards Plaintiffs. (Am. Complaint). On July 5, 2007, Plaintiffs filed their original Complaint (Doc. #1), which they subsequently amended asserting claims under 42 U.S.C. § 1981 and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and seeking damages of not less than $250,000. (Doc.

1

#3).  Specifically, each Plaintiff alleges Defendant discriminated against them based on their race and retaliated against them for activities protected under § 1981 and the FMLA.[1]  *Id.*

A.    *Facts Concerning All Plaintiffs*

    1.    <u>Defendant's Business</u>

At all relevant times, the Crown Center Redevelopment Corporation ("Crown Center") contracted with Defendant to manage its properties. (Hill Depo., 15:3-13).  Defendant, either directly or through contractors, provided the following property management functions for Crown Center: security, maintenance, engineering, tenant relations, overseeing the operation of the power plant, and janitorial services.  *Id.* at 15:14-24.  Security officers employed by Defendant were responsible for ensuring the security of the Crown Center complex by patrolling numerous buildings and areas, writing reports, assisting guests, serving clientele, assisting in personal injury calls, making arrests, and generally protecting the property.  (Gerald Depo., 64:4-12; Harris Depo., 51:20-52:6).

Ken Nicolay ("Nicolay"), a Caucasian, was the President of Defendant. (Harris Depo., 83:10-17).  Defendant employed Gary Hill ("Hill"), a Caucasian, as the Director of Operations. (Hill Depo., 13:23-14:3; Gerald Depo., 53:17-21).  As Director of Operations, Hill handled budgetary issues, capital expenditures, major repairs, and strategic planning; additionally, Hill drafted business plans and oversaw operations, security, tenant relations, and engineering functions. (Hill Depo., 14:6-13).  However, Hill did not get involved in the daily operations of the security department. *Id.* at 14:14-18.

Defendant's Security Manager, Dave Ebert ("Ebert"), a Caucasian, reported directly to Hill.

--------

[1]Harris also appears to seek relief for FMLA interference based on his opposition brief. (Doc. #41).  As Plaintiffs' Amended Complaint (Doc. #3) does not present "a short and plain statement" of such a claim showing that Harris is entitled to relief as required under Fed. R. Civ. P. 8(a)(2), Harris has failed to state a claim for FMLA interference and therefore summary judgment is GRANTED with regards to the FMLA interference claim and it is DISMISSED.

2

(Rentschler Depo., 11:17-22; Gerald Depo., 54:7-9; Hill Depo., 14:19-23). From approximately March 2002 until July 2006, Charles Rentschler ("Rentschler"), also Caucasian, held the position of Security Operations Manager and reported to Ebert. (Hill Depo., 22:16-23:17, 24:1-18; Rentschler Depo., 10:12-17, 11:17-22). Prior to holding the position of Security Operations Manager, Rentschler served as a security officer. (Rentschler Depo., 9:7-10). Security supervisors, who directly supervised the security officers, reported to Rentschler. (Gerald Depo., 63:14-19; Rentschler Depo., 11:23-12:12).

In 2004, Defendant added the position of Human Resource Manager and hired Karen Mische ("Mische"), a Caucasian, to fill it. (Gerald Depo., 232:9-233:6; Hill Depo., 37:23-38:16). Prior to this, Helen Lindquist ("Lindquist"), Defendant's Property Manager, addressed human resource concerns. (Gerald Depo., 54:10-12; Hill Depo., 37:8-13). Lindquist is also Caucasian. *Id.*

2. Progressive Discipline Policy

Defendant had a policy and procedure manual that contained, among other things, the company's progressive discipline policy, which included an explanation of the purpose of the policy-- to apply equitable and consistent discipline. (Hill Depo., 99:20-100:4; Sept. 2003 Progressive Discipline Policy ("Sept. 2003 PDP"); Gerald Depo., 79:17-80:5). Defendant instructed employees to make themselves familiar with and understand the policies contained in the manual and consult the manual if they had any questions about policies or procedures. (Harris Depo., 41:22-42:7). The progressive discipline policy set forth what constituted discipline; a "Memo to File" was not a discipline or "step" in the progressive discipline process. (Sept. 2003 PDP; Harris Depo., 228:17-20, 308:12-21; Hill Aff. ¶10). The original progressive discipline policy outlined five progressive steps in the disciplinary process. (Sept. 2003 PDP). However, in March 2004, Defendant shortened the

3

number of steps to four. (Hill Depo., 102:13-19; March 2004 Progressive Discipline Policy ("March 2004 PDP")). Any employee who had discipline assessed at the time the policy was revised remained on the five-step process. (Hill Depo., 103:25-104:13). Under this policy, if an employee received a step and he/she had no infractions for twelve months, the employee would generally go back to no steps. *Id.* at 100:17-101:5.

This policy further explained that supervisors and managers recorded events in logs for each employee and that these events could lead to disciplinary action. (Sept. 2003 PDP; Gerald Depo., 80:6-10; Harris Depo., 184:15-185:17). Defendant used the logs to record coaching or counseling given to an employee, as well as both positive and negative notations about an employee's performance. (Gerald Depo., 320:15-19). Employees did not have access to the employee logs. (Harris Depo., 186:5-8).

Defendant issued discipline based upon the gravity of the incident or an accumulation of minor infractions. (Rentschler Depo., 57:14-21). Security supervisors could recommend a discipline, up to dismissal of the employee, which either Hill or Rentschler would then approve. (Rentschler Depo., 58:1-4. 59:19-24; Hill Depo., 112:13-23; Marshall Aff. ¶¶2-3). Rentschler merely ensured the basis for the discipline was properly documented and the discipline memorandum was grammatically correct. (Rentschler Depo., 58:5-59:2). He does not recall an instance where he denied a supervisor authority to discipline an employee. *Id.* at 59:14-18.

### 3. The August 18, 2003 Letter and Resulting Actions

On August 18, 2003, eight African-American security officers, including Gerald and Harris, signed a letter alleging race discrimination by Rentschler. (Aug. 18, 2003 Ltr; Gerald Depo., 120:25-121:14; Harris Depo., 93:8-94:2). Rentschler categorically denied the allegations in this letter.

4

(Rentschler Depo., 32:23-33:1). In response to this letter, Defendant hired attorney Charlie Harris to interview the signatories of the letter still employed by Defendant and investigate the allegations. (Sept. 2, 2003 Ltr). During these interviews, Michael Fletcher, an attorney representing the signatories, or a representative from his office, was present. (Sept. 10, 2003 Ltr; Hill Depo., 59:20-60:4). A court reporter transcribed each interview and reduced it to written transcripts. (Hill Depo., 56:1-4). No Caucasian employee was interviewed. *Id.* at 60:10-13.

On October 28, 2003, Charlie Harris interviewed Harris. (Harris Depo., 139:21-140:3). Harris fully outlined the problems he believed he was having with Defendant as of that date. (Harris Depo., 113:7-114:5, 139:16-140:10; Harris Interview Transcript). The following day, Charlie Harris interviewed Gerald during which she responded to questions presented to her as if under oath. (Gerald Depo., 142:18-143:3, 145:3-24; Gerald Interview Transcript). During her interview, Gerald stated both African-American and Caucasian security officers had problems with Rentschler. (Gerald Depo., 148:12-149:18).

After the interviews were completed, Hill and Nicolay reviewed them and discussed an appropriate course of action. (Hill Depo., 56:5-57:2). Hill and Nicolay determined the issues stemmed from Rentschler's management style and had nothing to do with race and that Caucasian employees also had complaints regarding Rentschler. *Id.* at 56:16-19, 61:16-20, 65:12-16, 65:23-66:1; Hill Aff. ¶16. The action plan developed by Hill and Nicolay included the following: (1) Hill was to attend the security management staff meetings and supervisors' meetings; (2) security supervisors' meetings were held bi-weekly instead of monthly; (3) Defendant increased communications with employees; (4) Defendant encouraged employees to submit comments on the anonymous employee surveys; (5) each department's survey was shared with the other departments; (6) Defendant issued written

5

responses to comments made on the employee surveys; (7) Hill counseled Rentschler regarding his management style; (8) Defendant created a full-time Human Resource Manager position; and (9) Defendant held small group meetings in the Security and Operations departments. (Hill Depo., 61:21-65:11, 68:14-69:7, 83:21-24; Hill Aff. ¶17). Hill met with Rentschler two or three times about his management style shortly after the conclusion of the interviews and discussed the importance of body language, demeanor, and tone of voice. (Hill Depo., 66:19-68:13, 69:8-70:5; Hill Aff. ¶22).

At some point in late 2003, Defendant held a security department meeting. (M. Williams Aff. ¶8). During this meeting, Hill addressed the issues that had arisen from the August 18, 2003 letter and asked that any person hearing negative comments about the company from a signatory report those comments to him. *Id.* at ¶¶10-17. While speaking, Hill appeared angry. *Id.* at ¶18. Neither Gerald, Harris, or Marshall presented any evidence that they attended this meeting.

After the investigation concluded, Shirley Lewis ("Lewis") told Hill she regretted signing the letter. (Hill Depo., 132:21-133:10). Hill also recalled conversations with Mike Williams ("M. Williams"), one of the signatories, in which M. Williams told Hill there was no merit or truth to the August 18, 2003 letter. (Hill Depo., 133:11-134:3, 136:18-137:13). M. Williams stated in his Affidavit that he never made these statements. (M. Williams Aff. ¶3). Hill further testified that Gerald had indicated to him that things were improving. (Hill Depo., 134:4-9). Gerald denied making such statement. (Gerald Aff. ¶12). Months after the investigation concluded, Lewis, Abiodun Black, and Josanda Epperson, all signatories, separately apologized to Rentschler for their participation in the letter. (Rentschler Depo., 37:9-24).

    4.      <u>The August 23, 2004 Memorandum</u>

In an eight-page memorandum to Nicolay dated August 23, 2004, Hill expressed frustration over recent meetings between Mische and signatories of the August 18, 2003 letter still employed with Defendant. (Aug. 23, 2004 Memo). Hill felt these meetings had renewed the same feelings and perceptions that had precipitated the August 18, 2003 letter. *Id.* He named four employees–Lewis, M. Williams, Gerald, and Harris–whom Defendant was still trying to resolve their issues with the company. *Id.* However, Hill reiterated he did not feel race discrimination was occurring and that these four individuals had made positive and complimentary statements about "how things were going" prior to their meetings with Mische. *Id.* Hill then referred to the signatories of the August 18, 2003 letter as "a group" which continued "to make every effort to be counterproductive." *Id.* Hill further stated he "simply refuse[d] to yield ground to 3 or 4 employees who continue[d] to focus their effort and energy in a 'mean hearted' manner which impair[ed] the overall success of the Security Department and [Defendant's] contractual obligations." *Id.* Hill continued, stating Defendant "need[ed] to exercise every legal means available to find a remedy. [He was] not, repeat, not going to sit idle or accept another slanderous situation such as the one that occurred [in 2003]." *Id.*

B.   *Facts Concerning Gerald Only*

Gerald, an African-American, began working for Defendant on September 13, 2002 as a security officer. (Gerald Depo., 35:1-3, 54:13-19, 58:1-5). As Security Operations Manager, Rentschler hired Gerald. (Rentschler Depo., 108:8-10). While serving as a security officer, Gerald's direct supervisors included Channell Evans ("Evans"), African-American; Nancy Audsley ("Audsley"), Caucasian; Sheryl Williams ("Williams"), Caucasian; Nancy Taylor ("Taylor"), Hispanic; and Lewis, African-American. (Gerald Depo., 31:15-17, 63:3-13, 190:20-25, 277:14-18).

Gerald understood Defendant's problem resolution policy was written and contained in the

7

company's policy and procedure manual. *Id.* at 77:6-9. On at least three occasions, Gerald signed acknowledgment forms indicating that she had received or had access to a copy of Defendant's policy and procedure manual, that she understood the information in the manual, and that should she have any questions, she should consult the manual and/or her supervisor for clarification. (Gerald Depo., 58:21-62:12, 276:19-277:7; Sept. 2002 Acknowledgment; Oct. 2003 Acknowledgment; May 2004 Acknowledgment). Gerald further understood that if she had any concerns or complaints, she was to submit them in writing to management and if she felt like she could not submit them to a particular person, she could submit her concerns or complaints to a manager higher up in the company. *Id.* at 76:13-77:5. Gerald also admitted she has never seen the employee logs. *Id.* at 308:14-19.

On January 1, 2003, Gerald injured herself at work and her doctor placed her on work restrictions. (Gerald Depo., 69:22-70:3, 82:16-83:9, 87:1-3; Rentschler Aff. ¶¶74-75). Due to these restrictions, Gerald requested a light duty position from Rentschler. (Gerald Depo., 70:4-22) However, Defendant had no light duty position available that met her medical restrictions and her capabilities because she had not been trained in the company's command center dispatch operations. *Id.* at 216:7-15, 217:7-10; Rentschler Aff. ¶¶76-77). Instead, Gerald was off work for three days, using vacation and sick leave. (Rentschler Aff. ¶78). In a written memo drafted six months later, Gerald sought restoration of her vacation and sick time used during that three day period, arguing Defendant allowed three Caucasian co-workers to take light duty. (June 27, 2003 Memo; Gerald Depo., 85:19-86:11; 87:7-88:1, 93:13-15; 112:6-113:4). However, Gerald had no knowledge of these three individuals' medical restrictions. (Gerald Depo., 88:2-25, 89:24-93:12). Defendant awarded light duty on a case-by-case basis, taking into consideration the type of injury sustained, the medical

8

restrictions issued by the medical provider, the availability of work, and the priority of the company's projects and assignments. (Aug. 4, 2003 Memo).

In September 2003, Gerald received a performance review from her supervisors, wherein she received an overall rating of "needs improvement." (Gerald Depo., 164:23-165:5; Sept. 2003 Perf. Review). She believes the September 2003 review was unfair because neither reviewing supervisor sufficiently observed her work performance. (Gerald Depo., 168:15-169:9). As a result of Gerald's complaints to Defendant's management team, Defendant accommodated Gerald by giving her another performance review on April 6, 2004. *Id.* at 245:11-246:16; April 2004 Perf. Review. Gerald again received a "needs improvement" rating, which she believes was unfair, based on her race, and was in retaliation for the August 18, 2003 letter alleging race discrimination. (Gerald Depo., 120:25-121:14, 246:22-247:1, 254:1-17). Leading up to the April 2004 review, Defendant offered Gerald and her attorney an opportunity to view her employee log and communicated with Gerald on multiple occasions. (Sept. 22, 2003 Ltr; March 16, 2004 Hill Memo; March 16, 2004 Mische Memo). During these communications, Hill informed Gerald that performance reviews were simply constructive tools in assessing performance and outlining areas in which an employee needed to improve. (Gerald Depo., 222:23-223:10; Hill Aff. ¶¶46-48).

Prior to February 2005, Gerald received Step 1 and Step 2 for violations of company policies. (Gerald Step 1; Gerald Step 2). Gerald does not believe either of these disciplinary actions were issued because of her race or in retaliation for any protected activities. *Id.* at 195:12-25; 284:6-8; 288:9-16.

On February 17, 2005, Rentschler witnessed Gerald, while on duty, sitting in a stopped security vehicle on Grand Boulevard with an individual leaning into her car through the opened passenger

window. (Rentschler Aff. ¶¶82-83; Rentschler Depo., 113:20-115:2; Step 3). Rentschler was unaware of any other security officer committing such a serious safety infraction. (Rentschler Aff. ¶84). Later that day, Rentschler checked the audio recordings and found that Gerald had no reason to be on Grand Boulevard. (Rentschler Aff. ¶85; Step 3). He also reviewed her daily activity log, which he found incomplete, and her probe[2] count, which had a 36-minute gap. (Rentschler Aff. ¶¶86-87; Step 3). Gerald's employee log further showed at least three performance issues documented by supervisors during the previous two months, including supervisors counseling her that same day about her demeanor towards them and failure to acknowledge them. (Step 3; Gerald Employee Log). Based upon the severity of the February 17, 2005 incident and the culmination of other incidents as described above, Rentschler found Step 3 was warranted and issued it to Gerald the next day. (Rentschler Aff. ¶90; Step 3).

Gerald stated Micah Booker, a former employee who was involved in litigation against Defendant at the time, was the individual leaning into her vehicle; however, Gerald presents no evidence that Rentschler knew Mr. Booker was the individual. (Gerald Aff., ¶22). Rentschler stated he did not know it was Mr. Booker. (Rentschler Depo., 115:3-5).

In response to receiving Step 3, Gerald submitted a problem resolution complaint to Rentschler requesting Step 3 be removed from her file. (Gerald Depo., 353:14-354:6, 360:4-16; Feb. 25, 2005 Memo). In this submission, Gerald did not complain that Step 3 was discriminatory or that she was treated differently because of her race. (Feb. 25, 2005 Memo). However, in her deposition, Gerald stated Step 3 was an act of race discrimination because she believes Caucasian security officers were

_____

[2]"A probe is a small device that security officers must press a minimum of every 20 minutes throughout the complex while they are on patrol to document the patrol and ensure the security officers' safety." (Rentschler Aff. ¶88).

10

outside their assigned areas but Defendant did not discipline them. (Gerald Depo., 355:12-356:10). She bases her belief on what other security officers told her, not on other employees' personnel files or disciplinary records. *Id.* at 151:10-24, 154:8-13.  On March 9, 2005, Rentschler met with Gerald and informed her that he would not overturn Step 3 because Gerald's actions on February 17, 2005 were not appropriate and Gerald did not refute that any of the incidents listed in Step 3 had occurred. (March 9, 2005 Memo; Rentschler Aff. ¶92).

Unsatisfied with Rentschler's response, Gerald elevated the problem resolution policy by complaining to Mische about the issuance of Step 3. (Gerald Depo., 379:4-8). After meeting with Gerald, Mische affirmed Rentschler's decision because it was supported by proper documentation. (Gerald Depo., 379:9-11, 380:22-381:14; March 14, 2005 Memo).  Gerald chose not to appeal Mische's decision to Hill even though the problem resolution policy allowed her to do so. (Gerald Depo., 381:15-382:1; Prob. Resolution Policy).

On March 18, 2005, Gerald began taking FMLA leave. (Gerald Depo., 382:5-15, 386:8-14). On May 16, 2005, upon the conclusion of her FMLA leave, Gerald resigned from Defendant's employ. (Gerald Depo., 382:21-383:2; Resignation).  While on FMLA leave, no one from Defendant's employ said or did anything to Gerald that she considered harassment or improper conduct.  (Gerald Depo., 386:15-387:7).  Nevertheless, Gerald felt she was forced to quit her job because she believed she was a target since signing the August 13, 2003 letter and had received Step 3.  *Id.* at 393:19-394:17. However, no one told her she had to quit. *Id.* at 394:18-21.

In Gerald's post-deposition affidavit, Gerald asserted she and Lewis were forced to converse outside the view of security cameras.  (Gerald Aff. ¶8).  Gerald also claimed she was told to refrain from speaking to another African-American co-worker until her shift ended. *Id.* at ¶12-13.

11

Gerald admitted Rentschler never did or said anything to indicate to her that he harbored any racial bias nor did he use any racially derogatory terms toward her. (Gerald Depo., 119:13-120:13, 263:1-6). In fact, Gerald told Mische that Rentschler never directly harassed her because he did not speak to her. *Id.* at 268:18-269:5; March 25, 2004 Memo. Further, Gerald never heard any member of Defendant's management team use racial slurs. (Gerald Depo., 119:6-12).

C.     *Facts Concerning Harris Only*

Harris, who is African-American, began working for Defendant's predecessor, Milton Meyer, in early 1989 as a security officer. (Harris Depo., 24:11-25, 34:18-20). Defendant eventually took over the responsibility for providing security services for Crown Center from Milton Meyer and therefore employed Harris. *Id.* at 25:8-25. While serving as a security officer for Defendant, Harris' direct supervisors included Ron Tonkinson ("Tonkinson"), Caucasian; Audsley; Carol O'Shaughnessy ("O'Shaughnessy"), Caucasian; and Lewis. (Harris Depo., 49:10-14, 49:23-50:2, 56:2-25, 75:3-24).

On at least three occasions during his employment with Defendant, Harris signed documents acknowledging receipt of the company's policy and procedure manual, which he knew prescribed the policies and procedures of the company. (Harris Depo., 41:12-21, 42:8-16, 44:2-24; Harris Manual Acknowledgments). In fact, Harris testified he read the manual to ensure he understood Defendant's expectations. (Harris Depo., 46:9-16). Harris understood Defendant had a problem resolution process contained in the manual that encouraged employees to report concerns to management. (Harris Depo., 133:19-25, 135:9-23, 136:17-137:1, 138:7-22).

Harris stated he believes his performance reviews, Memos to File, and counseling on performance issues were not motivated by race until his December 2002 performance review. (Harris Depo., 47:8-11, 50:5-51:12, 53:5-16, 54:14-16, 55:5-8, 187:19-188:16, 188:23-189:15, 192:11-193:4,

12

268:7-22). While he did not believe his December 2002 performance review to be an act of race discrimination at the time given, this belief developed at some later point. *Id.* at 65:12-19.

As a condition of his employment as a security officer, Harris was required to have a Kansas City, Missouri Police Department ("KCPD") commission card authorizing him to carry a firearm on the job. (Harris Depo., 51:13-19, 52:11-12). Sometime before April 18, 2003, Harris received a letter scheduling his recertification exam for his firearm commission, which instructed Harris to bring his weapon, lead-free ammunition, baseball cap, long sleeves, loose-fitted pocketed long pants, belt, and holster. *Id.* at 271:8-272:7, 278:1-14; Firearms Schedule Ltr. On the morning of his recertification exam conducted by a KCPD representative, Harris forgot his utility belt that contained his holster. *Id.* at 277:13-278:20. Rentschler asked the KCPD's range master what they should do, and the range master informed them that Harris would have to arrange another date to recertify and that Harris would not have a commission in the meantime, meaning he could not carry a firearm on the job. *Id.* at 279:15-280:16; Rentschler Aff. ¶¶105-06.

As a result of Harris' failure to recertify his commission on the scheduled date, the KCPD suspended Harris' license to carry a firearm as a security officer. (Apr. 23, 2003 KCPD Suspension Ltr). After Rentschler discovered Defendant had no work that did not require a firearm commission for Harris , he was permitted to take vacation while his license was suspended. (Harris Depo., 281:4-16). This action was consistent with a 1992 incident in which Harris lost his commission and Defendant permitted him to take vacation time. *Id.* at 257:20-259:5, 291:2-292:3; KCPD Suspension Ltr. Rentschler testified that if a security officer lost his/her commission, he/she could not work for Defendant because if the security officer was on the complex in uniform and not commissioned, Defendant would be "in trouble" with the Board of Police Commissioners with regard to its licensing.

13

(Rentschler Depo., 74:12-75:15; Rentschler Aff. ¶¶107-10). Defendant claimed a representative at the KCPD Commission Board indicated Harris could do office work on the premises while his license was suspended. (Harris Depo., 279:17-281:6).

Harris believes he should have been given light duty while he waited to take his recertification exam but cannot point to any Caucasian employees to whom Defendant gave light duty under similar circumstances. (Harris Depo., 281:16-20, 282:8-284:12 285:19-287:2, 288:2-9). Additionally, Harris was unaware of any policy that stated a security officer whose commission had been suspended would be offered light duty work. (Harris Depo., 293:17-23). On May 20, 2003, Harris received Step 1 because he went to the firearms range without the proper equipment. (Harris Depo., 289:7-290:14; Harris Step 1; Rentschler Depo., 73:8-25).

On July 31, 2003, Harris received Step 2 from O'Shaughnessy for using his personal cell phone while on duty on at least five occasions and for improper use of the security scooter. (Harris Depo., 294:14-295:2, 296:18-297:2; Step 2). Harris believes Step 2 was discriminatory and based on race even though he had been previously counseled about these performance issues. (Harris Depo., 295:15-17). Harris believes four Caucasian security officers were treated more favorably than he was treated with regard to cell phone and scooter usage but admitted he had not seen the Caucasian security officers use their cell phones on duty as much as he had. (Harris Depo., 206:18-207:10, 297:3-24). However, Caucasian co-workers were counseled about carrying cell phones while on duty and one Caucasian co-worker received Step 2 in part for using his cell phone while on duty. (Hill Aff. ¶¶59-61). In fact, Defendant ultimately discharged one Caucasian employee for violations of the cell phone usage policy. (Hill Aff. ¶63). Co-workers who misused a scooter were either counseled by a supervisor or Harris does not know if they were counseled. (Harris Depo., 210:3-20, 212:9-14, 213:1-

7, 213:17-214:2, 216:12-18, 217:2-15, 218:4-8; Hill Aff. ¶64). Harris understood, based on multiple conversations with his supervisors and the issuance of Step 2, that he was not to use his cell phone while on duty; however, even after the issuance of Step 2, Harris continued using his cell phone while on duty and was again counseled regarding cell phone usage on September 16, 2003. (Harris Depo., 295:24-296:17; SOF (Harris) ¶119).

On December 21, 2003, Harris received Step 3 from Lewis for using his personal cell phone while on duty. (Harris Depo., 298:15-299:12; Harris Step 3). Harris agreed Step 3 represented the sixth documented incident of him using his cell phone while on duty. (Harris Depo., 299:23-300:2). Nowhere in Harris' lengthy comments to Step 3 did he state that the discipline was motivated by race. (Harris Depo., 301:25-302:4; Harris Step 3). Although he did not put it in his comments, Harris thought it would have been important for him to document his concerns regarding race discrimination in his comments on Step 3. (Harris Depo., 302:18-22).

On March 5, 2004, Lewis gave Harris a performance review wherein he received a rating of "needs improvement" in three of ten categories. (Harris Depo., 77:2-78:3; Harris Mar. 2004 Perf. Review). Harris believes his race played a part in Lewis' assessment of his performance on his March 2004 review. (Harris Depo., 80:21-25). Harris' allegation that this review was based on race is solely premised on Harris guessing that others provided input to Lewis for his review. (Harris Depo., 81:1-82:17). However, Harris admitted that he neither witnessed Lewis discussing or knew if Lewis discussed this review with any manager or supervisor. (Harris Depo., 84:20-25, 86:8-19). In the comments section of his March 2004 review, Harris did not complain that race played a part in the performance review. (Harris Depo., 87:3-16; Harris Mar. 2004 Perf. Review).

15

On July 1, 2004, Harris received a Memo to File from Lewis and O'Shaughnessy regarding attendance issues. (Harris Depo., 313:6-23; July 2004 Memo to File). Harris believes this Memo to File was an act of race discrimination because he was not informed of his schedule change. (Harris Depo., 314:4-14).

On September 7, 2004, Harris received Step 4 from Lewis due to violations of the attendance and punctuality policy. (Harris Depo., 223:19-224:10; Harris Step 4, Hill Aff. ¶65). Defendant treated Harris in the same fashion as other employees with regard to violations of the attendance and punctuality policy. (Hill Aff. ¶¶66-74). Several Caucasian employees also received a step or were discharged for violations of the attendance and punctuality policy. *Id.*

Nevertheless, Harris believes Step 4 was an act of race discrimination based in part upon an occurrence with Rentschler ten years earlier. (Harris Depo. 316:10-317:7). At the time, Harris and Rentschler were both security officers. (Harris Depo., 260:19-261:6; Rentschler Depo., 70:11-71:10; Rentschler Aff. ¶¶96-104). Harris would hang his clothes on the outside of his locker, which prevented Rentschler from easily accessing his locker. (Rentschler Depo., 70:11-71:10; Rentschler Aff. ¶¶98-99). In response, Rentschler would bend Harris' clothes hanger or twist a hanger around Harris' locker, and Harris would do the same to Rentschler's locker. *Id.* After clothing hooks were installed on the walls, Rentschler cannot recall any further issues with Harris. (Rentschler Depo., 71:19-72:2; Rentschler Aff. ¶101). Rentschler admitted his behavior with regard to this incident was childish but was not based in any way on Harris' race. (Rentschler Aff. ¶¶99, 102). Harris believed the incident was based on Harris' race because Rentschler was jealous of him, because "[Harris is] black, and [Rentschler]'s white," and because Harris "just felt that [Rentschler] was prejudiced." (Harris Depo., 261:7-264:15, 265:2-7). However, Rentschler never used any racial slurs towards

16

Harris or said anything to Harris to indicate that Rentschler was moving Harris' clothes because of Harris' race. (Harris Depo., 260:9-12, 264:16-20).

On November 19, 2004, Harris was hospitalized and called Defendant between 10:30 and 11:00 p.m. to inform the company that he would not be able to work on November 20th. (Harris Depo., 140:11-141:9, 142:2-23, 143:6-144:6). Although Defendant considered this absence unexcused pursuant to Defendant's attendance policy, Harris did not receive a formal step in the disciplinary process but was warned that another unexcused absence would result in a formal step. (Harris Depo., 146:7-147:23, 156:6-157:1; Rentschler Aff. ¶114; Attendance Policy).

On or about November 23, 2004, Harris submitted a statement to Rentschler contesting his unexcused absence pursuant to the problem resolution policy and spoke with Mische. (Harris Depo., 147:20-14:3; Rentschler Aff. ¶¶115-16; Nov. 23, 2004 Submission). On November 24, 2004, Mische sent a memorandum to Harris, which noted that she had enclosed FMLA paperwork. (Harris Depo., 149:8-21; Nov. 24, 2004 Memo). Harris claims Mische did not attach FMLA paperwork to the memorandum, but he admitted that he did not subsequently ask for the missing paperwork. (Harris Depo., 150:4-151:16, 152:4-7). In a written response to Harris' November 23, 2004 submission, Rentschler stated Harris' absence on November 20, 2004 constituted an incident under Defendant's attendance policy, and therefore, Rentschler could not grant Harris' request to have the incident removed from his record. (Harris Depo., 152:8-153:4; Rentschler Resp. to Nov. 23, 2004 Submission; Rentschler Aff. ¶116).

In following the problem resolution process, Harris submitted statements and documents to Mische on December 7, 2004 and to Hill on December 13, 2004. (Harris Depo., 153:17-23, 158:13-159:1; Dec. 7, 2004 Submission; Dec. 13, 2004 Submission). Both Mische and Hill affirmed the

17

issuance of an unexcused absence. (Mische Resp. to Dec. 7, 2004 Submission; Hill Resp. to Dec. 13, 2004 Submission). In his response to Harris, Hill outlined the attendance policy and explained that Harris chose not to use FMLA to excuse the absence but that Harris could submit FMLA paperwork to negate the unexcused absence that occurred on November 20, 2004. (Hill Resp. to Dec. 13, 2004 Submission). Despite this, Harris did not immediately follow up with Mische regarding FMLA paperwork. (Harris Depo., 161:21-162:1).

Unhappy with Hill's response, Harris elevated the problem resolution process to the next and final step. (Harris Depo., 163:18-164:25). On December 29, 2004, Harris placed documents on Nicolay's desk, and then submitted additional documents to Nicolay in early January 2005. (Harris Depo., 165:1-1663, 167:9-168:7; Dec. 29, 2004 Submission). Before Nicolay could respond to Harris' submission, Harris received a Memo to File for sleeping during an employee meeting on January 8, 2005. (Harris Depo., 229:14-25, 241:17-242:4; Jan. 8, 2005 Memo to File). Harris denied that he was sleeping during the meeting but admitted that he was sitting with his head in his right hand. (Harris Depo. 230:6-8, 240:23-241:10).

On January 18, 2005, Harris met with Nicolay to discuss his sleeping during the employee meeting, his problem resolution submissions with regard to his November 20, 2004 absence, and his general relationship with the company. (Harris Depo., 169:5-170:9, 243:12-245:16, 248:23-252:5; Jan. 18, 2005 Meeting Notes). Nicolay informed Harris that he believed Harris was not sleeping during the employee meeting and then issued a memorandum stating such. (Jan. 18, 2005 Meeting Notes; Jan. 21, 2005 Memo). Nicolay noted that he believed Harris had been supplied with FMLA paperwork but chose not to use FMLA. *Id.* He further noted Harris told him Mische indicated that FMLA would not remove Harris' write-up for his unexcused absence. *Id.*

18

At some point before February 12, 2005, Harris contacted an individual named Cleveland at the "Labor Board" telling Cleveland that he had not received any FMLA paperwork, and Cleveland said he would call Mische. (Harris Depo., 173:10-174:22). On or about February 14, 2005, Harris received a memorandum from Mische, which Harris understood to be a by-product of his discussions with Nicolay. (Harris Depo., 170:20-171:23; Feb. 14, 2005 Memo). This memorandum attached FMLA paperwork to resolve his absence on November 20, 2004. (Harris Depo., 172:5-12; Feb. 14, 2005 Memo). Upon receipt of this memorandum, Harris took his FMLA paperwork to his doctor. (Harris Depo., 172:13-15).

On February 17, 2005, Defendant terminated Harris from its employment. (Harris Depo., 31:23-25, 317:19-318:2). Harris' supervisor, Lewis, made the decision to discharge Harris following four performance issues with him in less than three months. (Harris Termination Memo). Williams, Mische, Rentschler, and Hill were also involved in Harris' discharge. (Def. Resp. to Harris' First Interrogatories ¶9). The first incident listed on Harris' termination document indicates Harris failed to complete a report about an individual harassing a guest in mid-December 2004. (Harris Termination Memo). Lewis next stated Harris had a negative demeanor during a shift briefing meeting on January 10, 2005. *Id.* Lewis then proceeded to describe an incident in which Harris forgot to pick up a key from a tenant on February 3, 2005, which by itself could have resulted in his discharge. *Id.*; Harris Depo., 359:4-9. Harris is unaware of any Caucasian security officers who forgot to pick up keys when instructed and were not disciplined. (Harris Depo., 360:24-361:4). The fourth incident on the termination document indicated that Harris forgot to respond to a store's report of water damage on February 14, 2005. (Harris Termination Memo).

Harris believes that his discharge was retaliatory based upon his participation in the problem resolution process regarding his November 20, 2004 absence and was discriminatory due to the incident that occurred between he and Rentschler in the 1990s. (Harris Depo., 265:24-266:4, 346:14-247:24). Harris also believes he was terminated because he called Cleveland at the "Labor Board" about FMLA paperwork. (Harris Depo., 323:18-324:12, 346:20-347:24). However, Harris does not know if Cleveland spoke with Lewis, Rentschler, or Ebert about Harris' FMLA paperwork. (Harris Depo., 181:11-22, 182:1-6, 324:13-325:4).

Harris admitted employees of different races had problems with Rentschler's management style--for example, Harris admitted that Caucasian and Hispanic employees also had problems with Rentschler. (Harris Depo., 120:4-121:6). In fact, Harris heard several Caucasian employees complain about Rentschler treating them unfairly. (Harris Depo., 121:7-123:4, 125:4-126:1, 162:25-127:19, 129:5-130:17). Harris submitted the completed FMLA paperwork on February 28, 2005. (Harris Depo., 172:16-24). The next security officer Defendant hired after Harris' discharge was African-American. (Def. Resp. to Pls. Req. For Prod. ¶19). Furthermore, Harris never heard any racial slurs or experienced any social threats when employed by Defendant. (Harris Depo., 114:20-116:8).

D.    *Facts Concerning Marshall Only*

On September 21, 2007, Marshall filed a Voluntary Petition seeking Chapter 13 bankruptcy protection in the United States Bankruptcy Court for the Western District of Missouri ("Bankruptcy Court"), Case No. 07-43314-drd13. (Bankruptcy Petition; Marshall Depo., 126:12-25). In her Statement of Financial Affairs contemporaneously submitted to the Bankruptcy Court with her voluntary petition, Marshall declared under penalty of perjury that she had no suits or administrative proceedings "to which the debtor is or was a party within one year immediately preceding the filing

20

of this bankruptcy case." (Statement of Financial Affairs). During a hearing before the Bankruptcy Court on October 25, 2007, Marshall testified under oath that her filings with the Bankruptcy Court were accurate. (Bankruptcy Court Hearing Transcript). On November 20, 2007, Marshall filed an Amended Statement of Financial Affairs, declaring again under penalty of perjury that she had no suits or administrative proceedings "to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case." (Am. Statement of Financial Affairs). The Bankruptcy Court confirmed Marshall's Amended Chapter 13 Plan on May 5, 2008, resulting in the discharge of her debts. (Confirmation Order). The record is void of any evidence suggesting Marshall has informed the Bankruptcy Court of the pending action since May 5, 2008.

## II.     Standard

Pursuant to Fed. R. Civ. P. 56, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or unnecessary will not be considered. *Id.* In the absence of a factual dispute relating to an essential element of a party's claims, the Court will proceed to determine whether that party is entitled to judgment as a matter of law. *See E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001). In determining whether summary judgment is appropriate, the Court views all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). However, Plaintiffs may not rely on conclusory statements but must "point to evidence in the record sufficient

21

to raise a genuine issue for trial." *Jeseritz v. Potter*, 282 F.3d 542, 545-46 (8th Cir. 2002) (quotations and citations omitted).

**III. Analysis**

*A. Marshall's Claims*

"The doctrine of judicial estoppel 'protects the integrity of the judicial process.'" *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006) (*citing Total Petroleum, Inc. v. Davis*, 822 F.2d 734, 738 n.6 (8th Cir. 1987)). "A court invokes judicial estoppel when a party abuses the judicial forum or process by making a knowing misrepresentation to the court or perpetrating a fraud on the court." *Id.* When a party states facts under oath during the course of one lawsuit, judicial estoppel prevents that party from denying those facts in a second suit even if the parties in the first suit are not identical to the parties in the second suit. *Id.* (*citing Monterey Dev. Corp. v. Lawyer's Title Ins. Corp.*, 4 F.3d 605, 609 (8th Cir. 1993)). "Therefore, a party that takes a certain position in a legal proceeding, 'and succeeds in maintaining that position,' is prohibited from thereafter assuming a contrary position." *Id.* (*citing New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)).

When determining whether to apply judicial estoppel, the Court considers whether (1) "a party's later position [is] clearly inconsistent with its earlier position;" (2) "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750-51 (internal quotations and citations omitted). These factors do not establish "inflexible prerequisites or an

22

exhaustive formula." *Id.* at 751. Rather, "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *Id.*

Marshall presents an inconsistent position to this Court from the position she took in the Bankruptcy Court. Under the Bankruptcy Code, a debtor must disclose all legal interests in her property, including pending causes of action for monetary damages, in her bankruptcy petition. 11 U.S.C. §521(a)(1). *See, also, United States ex rel. Gerbert v. Trans. Admin. Servs.*, 206 F.3d 909, 913 (8th Cir. 2001). "A debtor's failure to list a claim in the 'mandatory bankruptcy filings is tantamount to a representation that no such claim existed.'" *Stallings*, 447 F.3d at 1047 (*citing In re Superior Crewboats, Inc.*, 374 F.3d 330, 335 (5th Cir. 2004)). It is uncontroverted that Marshall has failed to disclose to the Bankruptcy Court the pendency of the instant action, one in which Plaintiffs seek $250,000 in damages, and continues to deny the Bankruptcy Court of this information. Marshall's position in this case that she possesses viable causes of action against Defendant is clearly inconsistent with her representation to the Bankruptcy Court that she has no such claims.

The second factor is also established. "Adoption does not require a formal judgment; rather, it only requires that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition." *Superior Crewboats*, 374 F.3d at 335 (quotations and citations omitted). The Bankruptcy Court confirmed Marshall's Amended Chapter 13 Plan based upon her representations to that court and thereby adopted her inconsistent position. Thus, Marshall has created a perception that either this Court or the Bankruptcy Court has been misled.

Finally, Marshall would derive an unfair advantage if not estopped. By failing to disclose the pendency of this lawsuit in her bankruptcy proceedings, Marshall derived an unfair advantage by

23

securing a discharge of her debts while at the same time maintaining the ability to keep the full benefit of any potential recovery in this matter and avoid payment to her creditors.

Marshall argues that this Court would cause her creditors a material disadvantage by granting Defendant's Motion for Summary Judgment; however, Marshall is the party who chose not to disclose the pendency of this action to the Bankruptcy Court. The record evidences no inadvertent or good-faith mistake by Marshall but rather that she deliberately misled the Bankruptcy Court. Marshall knew this action was pending at the time she filed her bankruptcy petition on September 17, 2007, yet still represented to the Bankruptcy Court that she was not a party to any current suit on at least three occasions. To prevent internal inconsistency and to preclude Marshall from "playing fast and loose" with the courts, *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993) (citation omitted), the Court GRANTS Defendant's Motion with respect to Marshall's claims.

B.     *Harris' FMLA Retaliation Claim*[3]

Under the FMLA, eligible employees are entitled to take up to twelve-weeks unpaid leave from work in any given twelve-month period for certain family or medical conditions, including a serious health condition that makes the employee unable to perform the functions of his position. *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 864-65 (8th Cir. 2006) (quotations and citations omitted). An individual asserting a violation of FMLA must bring his action no later than two years "after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). However, if the defendant willfully violated the plaintiff's rights under FMLA, the statute of limitation is extended to three years. § 2617(c)(2). To prove willfulness, "the plaintiff must

_____

[3]In Plaintiffs' Amended Complaint, Gerald also asserted a claim for FMLA retaliation. (Doc. #3). In Gerald's response brief, she abandoned this claim and therefore summary judgment is GRANTED as to it.

Case 4:07-cv-00475-GAF   Document 47   Filed 03/30/09   Page 24 of 34

demonstrate the employer 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Samuels v. Kansas City, Mo. Sch. Dist.*, 437 F.3d 797, 803 (8th Cir. 2006) (*citing Hanger v. Lake County*, 390 F.3d 579, 583 (8th Cir. 2004)) (applying the Supreme Court's definition for "willful" in the context of the Fair Labor Standards Act to the term "willful" under the FMLA). Therefore, "an employer's general knowledge about the statute's potential applicability, by itself, fails to demonstrate willfulness." *Id.*

Harris contends Defendant violated his FMLA rights on two occasions: the warning received for his November 20, 2004 absence and his discharge in February 2005. However, he did not file the instant action until July 2007, over two years after the alleged violations. Thus, in order to survive summary judgment by triggering the three year statute of limitation, Harris must demonstrate Defendant willfully violated his FMLA rights.

Harris claims the warning regarding his November 20, 2004 absence was Step 4 ½ on Defendant's progressive discipline policy. However, the policy's unambiguous language evidences no "½ step" existed and therefore the warning was just that, a warning, rather than a disciplinary action. Had Harris been disciplined on that date, he would have been terminated as he would have reached Step 5. Accordingly, Defendant could not have violated, either willfully or not, Harris' FMLA rights when warning him following his November 20, 2004 absence.

Harris also cannot demonstrate his February 2005 discharge was a willful violation of his FMLA rights. Harris has not presented any evidence that Defendant knew or acted with reckless disregard in relation to whether its conduct violated the FMLA. The record is void of any evidence suggesting Lewis, the supervisor who initiated Harris' termination, knew Harris had inquired into

Case 4:07-cv-00475-GAF   Document 47   Filed 03/30/09   Page 25 of 34

FMLA leave. Because there is no evidence Defendant willfully violated Harris' rights, his claim for FMLA retaliation is barred by the statute of limitation.

Nonetheless, even if Harris could demonstrate Defendant acted willfully in violating his rights, Harris still cannot succeed on his claim. Absent a showing of direct evidence, a FMLA retaliation claim is proved through the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 823 (8th Cir. 2002). Under this analysis, Harris must first establish a prima facie case of retaliatory discrimination. *Hite*, 446 F.3d at 865. To prove retaliation for asserting FMLA rights, Harris must show "[he] exercised rights afforded by the Act, that [he] suffered an adverse employment action, and that there was a causal connection between [his] exercise of rights and the adverse employment action." *Id.* Assuming Harris can establish each of these elements, the burden then shifts to Defendant "to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* The burden then shifts back to Harris to demonstrate that Defendant's proffered reason is pretextual. *Id.*

Defendant articulates a legitimate, nondiscriminatory reason for Harris' termination in Harris' termination memorandum in which Lewis described four incidents in the previous three months that warranted Harris' Step 5 and thereby his termination. Harris admits one of these incidents, forgetting to pick up a key from a tenant, by itself, could result in termination. However, Harris presents no evidence that Defendant's nondiscriminatory reasons for his termination are pretext. Defendant's Motion as to Harris' FMLA retaliation claim is therefore GRANTED.

C.    *Gerald's Constructive Discharge Claim*

"Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit." *Baker v. John Morrell & Co.*, 382 F.3d 816, 829

(8th Cir. 2004) (*citing Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir. 1999)). "To prove constructive discharge she must show: 1) a reasonable person in her situation would find the working conditions intolerable; and 2) her employer intended to force her to quit." *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 789 (8th Cir. 2007) (*citing Tatum v. Ark. Dep't. of Health*, 411 F.3d 955, 960 (8th Cir. 2005)). "This burden is substantial, as the bar is quite high in constructive discharge cases." *O'Brien v. Dept. of Agric.*, 532 F.3d 805, 810-11 (8th Cir. 2008) (internal quotations and citations omitted). In order to establish constructive discharge, conditions must be "sufficiently extraordinary and egregious." *Id.* (citation omitted). "The conduct complained of must have been severe or pervasive enough to create an objectively hostile or abusive work environment, and additionally the plaintiff must subjectively perceive the environment to be abusive." *Johnson v. Runyon*, 137 F.3d 1081, 1083 (8th Cir.1998) (internal quotation omitted).

Gerald complains Defendant's treatment of her preceding March 18, 2008 and the issuance of her Step 3, in congruence with recent terminations of Harris and Marshall, indicated to her that Defendant would soon terminate her. While an employee does not have to wait around to be terminated, *see Bragg v. Navistar Int'l. Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998), she must be reasonable. *Bublotz v. Residential Advantages, Inc.*, 523 F.3d 684, 869 (8th Cir. 2008) (*citing West v. Marion Merrell Dow, Inc*., 54 F.3d 493, 498 (8th Cir.1995)). An employee has an obligation "not to assume the worst and not to jump to conclusions too fast." *Id.*

Here, the conditions were not sufficiently extraordinary, egregious, severe or pervasive enough to warrant a finding of constructive discharge. Gerald resigned on May 16, 2005 after being on FMLA leave for approximately two months. Gerald points to only three circumstances creating an intolerable work environment: (1) speaking with her supervisor outside of security camera view; (2) being told

27

to refrain from conversing with a co-worker until her shift ended; and (3) being counseled for her demeanor towards supervisors. None of these circumstances rise to the level of intolerable working conditions and each circumstance occurred at least two months before her resignation. Additionally, during her two month FMLA leave, Gerald admits no one from Defendant's employ said or did anything she considered to be harassment or improper conduct. She never heard Rentschler, to whom she attributes her claims of retaliation and discrimination, make any racial comments or use any racially derogatory terms. Tellingly, Gerald never testified her working conditions were intolerable, abusive, or hostile.

Nor does Gerald present any evidence that Defendant intended for her to resign. Defendant never told or asked her to resign. Absent such evidence, Gerald's claim of constructive discharge fails. *See O'Brien*, 532 F.3d at 810-11. Accordingly, Defendant's Motion for Summary Judgment on Gerald's constructive discharge claim is GRANTED.

D.    *Gerald's & Harris' § 1981 Racial Discrimination Claims*

"Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." *King v. Hardesty*, 517 F.3d 1049, 1057 (8th Cir. 2008) (*citing Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC*, 471 F.3d 843, 846 (8th Cir. 2006)). To defeat Defendant's Motions for Summary Judgment, Gerald and Harris must set forth either (1) "direct evidence" of discrimination or (2) the *prima facie* case for discrimination under the *McDonnell Douglas* burden-shifting analysis and then rebut any proffered nondiscriminatory reasons for such discrimination as pretextual. *Id.* (citation omitted). "Direct evidence" refers to the causal strength of proof, not whether the evidence is circumstantial. *Id.* If the evidence, even if circumstantial, shows

28

a "specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated[ ] the adverse employment action," summary judgment may be avoided. *Id.* (alteration in original). Thus, a plaintiff with strong evidence that "illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial." *Id.* (citation omitted).

However, if Gerald and Harris lack evidence clearly pointing to an illegal motive, they may defeat summary judgment "by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis." *Id.* Under the *McDonnell Douglas* burden-shifting analysis, the employee must first prove her *prima facie* case. *Allen Health Sys.*, 302 F.3d at 832. If he or she successfully does so, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* Finally, the burden shifts back to the employee to show the employer's proffered reasons are merely pretextual. *Id.*

To prove the *prima facie* case for race discrimination, "a plaintiff must show the following: (1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently." *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008) (citation omitted). The plaintiff must "produce specific, tangible evidence showing a disparity in the treatment of similarly situated employees." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 882 (8th Cir. 2005).

Here, both Gerald and Harris fail to present evidence clearly indicating an illegal discriminatory motive. Both Gerald and Harris assert a meeting held sometime in late 2003, which

29

neither allege to have attended, serves as evidence of Defendant's discrimination. However, statements allegedly made at that meeting did not specifically reference Gerald's and Harris' race, nor were any racially derogatory statements made during the meeting. Instead, Hill appeared angry while discussing the results of the interviews of the signatories to the August 18, 2003 letter and the changes being implemented to address the concerns raised by these individuals. This evidence does not clearly point to discrimination. Nor does the August 23, 2004 memorandum penned by Hill. While Hill names both Gerald and Harris as potential "problems" for Defendant, Hill never once references their race. Both Gerald and Harris admit they have never heard Rentschler use any racial slurs or racially derogatory language. Further, Harris' belief that Rentschler harbored ill feelings towards him in the early 1990's due to Harris' race is unsupported by the evidence. In short, Gerald and Harris have failed to present evidence clearly pointing to race discrimination by Defendant. Therefore, the Court now turns to the *McDonnell Douglas* analysis.

Gerald's claims for race discrimination and disparate treatment involve (1) her April 2004 performance review and (2) her Step 3 discipline.[4] Gerald's claim that she received a negative performance review in April 2004 fails because she cannot establish the third element of the *prima facie* case, an adverse employment action. There is no evidence that Defendant used the review to subsequently "alter the terms or conditions of employment to the detriment of [Gerald]," *Thomas v. Corwin*, 483 F.3d 516, 529 (8th Cir. 2007) (*citing Burchett v. Target Corp.*, 340 F.3d 510, 518 (8th Cir.2003)), and therefore Defendant cannot be held liable for race discrimination for this review.

_____

[4]Gerald conceded her disparate treatment claim for denial of light duty in 2003 and therefore summary judgment is GRANTED as to that claim.

30

Further, Gerald cannot establish her Step 3 discipline was discriminatory based on her race. It is undisputed that Gerald committed the acts leading up to her Step 3 discipline, including allowing a pedestrian to lean into her security vehicle while being stopped on a street. Even if Gerald was meeting Defendant's legitimate job expectations despite these acts, Gerald provides only her beliefs that similarly situated Caucasian employees were treated differently, which cannot by itself defeat summary judgment. *See Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994).

Harris also cannot establish his discharge resulted from race discrimination.[5] Even assuming he can prove the *prima facie* case for discrimination, Harris cannot demonstrate Defendant's legitimate, nondiscriminatory reasons for his termination were pretextual. Prior to his discharge, Harris was on Step 4 out of five steps in Defendant's progressive disciplinary policy. Any additional infraction could have resulted in his termination. Between the issuance of Step 4 and his termination, Harris committed at least four violations of Defendant's policies. Harris presents no evidence of pretext, merely pointing to Hill's August 2004 Memorandum, which does not state anything negative about Harris' race.

Gerald and Harris presented no evidence clearly pointing to race discrimination and failed to meet their burden under the *McDonnell Douglas* test. For these reasons, Defendant's Motions are GRANTED with regards to Gerald's and Harris' race discrimination claims.

E.    *Gerald's & Harris' § 1981 Retaliation Claims*

---

[5]By failing to argue his disparate treatment claims in his opposition brief, Harris conceded he cannot recover for the following alleged discriminatory actions: (1) the denial of light duty work while his commission was suspended in May 2003; (2) his March 2004 performance review; (3) the treatment he received following his unexcused absence on November 20, 2004; and (4) his Step 2, Step 3, and Step 4 disciplines. *See United States v. NHC Health Care Corp.*, 163 F. Supp. 2d 1051, 1058-59 (W.D. Mo. 2001). Therefore, summary judgment is GRANTED as to those claims.

31

A plaintiff may either demonstrate retaliation through direct evidence or through the three-part *McDonnell Douglas* analysis. *See King*, 517 F.3d at 1057. Direct evidence does not extend to "stray remarks in the workplace," "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process itself." *Gross v. FBL Fin. Servs., Inc.*, 526 F.3d 356, 359 (8th Cir. 2008) (*quoting Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)). As stated above, "direct evidence" refers to the causal strength of proof, not whether the evidence is circumstantial. *King*, 517 F.3d at 1057. If the evidence, even if circumstantial, shows a "specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated[ ] the adverse employment action," summary judgment may be avoided. *Id.* (alteration in original).

As with Gerald's and Harris' race discrimination claims, the meeting in late 2003 and Hill's August 2004 Memorandum do not meet the standard for direct evidence of retaliation. While Hill's language evidences he is frustrated with the situation, he does state that "legal means" must be used to find a remedy. Hill did not make the ultimate decision to issue discipline against Gerald and Harris and therefore his statements are not direct evidence of retaliation. *See Schierhoff v. GlaxoSmithKline Consumer Healthcare*, 444 F.3d 961, 965-66 (8th Cir. 2006) (finding that a supervisor's comments about the plaintiff's age were not direct evidence because, while he may have been involved in the process of discharging the plaintiff, the supervisor was not the decision maker). Additionally, Hill drafted the memorandum nearly six months prior to the alleged retaliatory acts on February 17, 2005, thus weakening the link between the memorandum and the adverse employment action. *See Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 989 (8th Cir. 1999) (*citing Smith v. St. Louis Univ.*, 109 F.3d

32

1261, 1266 (8th Cir. 1997)).  Therefore, these statements do not demonstrate a specific link between the alleged retaliatory motive and the adverse employment actions.

Because Gerald and Harris have not presented direct evidence of retaliation, the Court proceeds under the *McDonnell Douglas* analysis.  First, Gerald and Harris must establish the *prima facie* case of retaliation by showing that they engaged in statutorily protected activity, that Defendant took adverse employment action against them, and that there is a causal connection between the two events. *King*, 517 F.3d at 1064 (internal quotations and citations omitted).  Even if Gerald and Harris can successfully meet this burden, they have not provided any evidence that Defendant's legitimate, nondiscriminatory reasons for the adverse employment actions are pretextual.[6]  For these reasons, summary judgment is GRANTED with respect to Gerald's and Harris' retaliation claims.

## CONCLUSION

Both Gerald and Harris have either conceded or failed to establish each of their claims of FMLA retaliation, race discrimination, and § 1981 retaliation. Marshall failed to disclose the pendency of this action in the Bankruptcy Court and therefore her claims are barred by the doctrine of judicial estoppel.  For these reasons, Defendant's Motions on Gerald's, Harris', and Marshall's claims are GRANTED.

**IT IS SO ORDERED.**

s/ Gary A. Fenner
Gary A. Fenner, Judge
United States District Court

---

[6]In fact, Gerald does not even address this element of the *McDonnell Douglas* analysis in her response brief (Doc. #41, pp. 22-32) and Harris merely refers the Court to his argument on race discrimination, which requires different evidence from a retaliation claim (Doc. #40, p. 30). *Compare King*, 517 F.3d at 1064 *with Fields*, 520 F.3d at 864.

33

DATED:   March 30, 2009